**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| JENNIFER OLSON,<br><br>Plaintiff,<br><br>v.<br><br>MILK SPECIALTIES COMPANY D/B/A ACTUS NUTRITION,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 3:26-cv-01012<br><br>**CIVIL COMPLAINT** |

# COMPLAINT

## I. NATURE OF THE CASE

1. Jennifer Olson began working at Actus Nutrition looking for a place where she could build a career. After her coworkers learned that she was married to a woman, they began treating her differently because she is a lesbian.

2. Olson did not make her sexual orientation a workplace issue. Her coworkers did. Jacob Schwalbach stopped treating Olson the way he had before learning about her wife. He became less willing to help her, more critical of her work, and at times refused to communicate with her directly. Then, on June 1, 2026, Schwalbach entered Olson's work area discussing an attempted burning of a Pride flag. He stated that he wished the person responsible had succeeded and said, in substance, "**Fuck them LGBTQ**." When Olson

reminded him that she was standing right there, Schwalbach responded: **"Oh yeah, that's right. You're one of them."**

3. Olson tried to keep working. On June 7, Schwalbach again entered Olson's work area and announced, "Happy *Dairy* Month, everybody," while glaring at her. In light of his prior comments and the change in his treatment of her after learning that she had a wife, Olson believed the discriminatory conduct was continuing. She therefore documented what was happening at work and later provided an audio recording to Actus Human Resources.

4. Actus reviewed the recording and considered the matter serious enough to suspend Schwalbach and Timothy Skidmore without pay while corporate Human Resources investigated. Actus advised Olson that termination was being considered. It later informed Olson that, after consulting corporate counsel, it would not rely upon portions of the recording and would return both employees to work.

5. By the time Actus returned Schwalbach and Skidmore to work, both men knew that Olson had reported them and had been warned against retaliation. Olson told Actus that she was afraid to return to work around the employees she had reported and asked what the company would do to protect her. Actus did not separate them from Olson. Instead, it permitted Olson to arrive and punch in several minutes early in an effort to avoid them during shift change. Olson nevertheless returned to work on June 19 and completed her shift without incident. She returned again for her next scheduled shift on June 21.

*(Line 6 continues on next page)*

6. When Olson opened her assigned locker inside the women's locker room, she found this:




*Photograph taken by Jennifer Olson on June 21, 2026, showing the inside of her assigned workplace locker.*

7. The message paired an anti-lesbian slur with a reference to Olson as a "snitch" and what Olson understood to mean "snitches get stitches." It appeared less than two weeks

after Olson reported anti-LGBTQ discrimination and only days after Schwalbach and Skidmore returned to work knowing that Olson had reported them.

8. Olson immediately photographed the message, reported it to Human Resources and Actus plant management, and left the facility. At Actus's direction, she went directly to the Sparta Police Department and reported the threat. Within minutes of Olson discovering the message, Actus therefore knew that the employee who had recently reported anti-LGBTQ discrimination had returned to work and found an anti-lesbian and retaliatory threat inside her assigned locker.

9. The threat did not merely make Olson uncomfortable at the idea of returning to her workplace facility. It left her terrified. Her healthcare providers documented severe anxiety, panic symptoms, hypervigilance, insomnia, nightmares, and renewed trauma symptoms following the events at Actus, and restricted her from returning to work.

10. Olson did not resign or abandon her employment. While medically restricted from returning to work, she remained in communication with Actus and pursued employment-related benefits and leave available to her. On July 23, 2026, Olson requested short-term disability and medical leave. Five days later, on July 28, Actus terminated her employment.

11. Voya subsequently approved Olson's short-term-disability claim effective July 23 and approved non-FMLA leave from July 23 through August 21, 2026: a period which included the date Actus terminated her.

12. This case arises from the discrimination Olson experienced because of her sexual orientation, the retaliation that followed when she reported it, Actus's decision to terminate her after that discrimination and retaliation left her medically unable to return to the

workplace, and Actus's subsequent conduct after Olson challenged her termination through the grievance process.

## II. PARTIES

**Plaintiff**

13. **Plaintiff Jennifer Olson** ("Olson") is an adult resident of Wisconsin. Beginning on April 20, 2026, Olson was employed by Defendant at its Actus Nutrition facility in Sparta, Wisconsin.

**Defendant**

14. **Defendant Milk Specialties Company d/b/a Actus Nutrition ("Actus")** is a Foreign Business Corporation with its Principal Office located at 7500 Flying Cloud Drive Suite 500, Eden Prairie, MN 55344. Actus conducts business in Wisconsin and operates the facility located at 427 E. Wisconsin Street, Sparta, Wisconsin 54656.

15. At all times relevant to this action, Actus was Olson's employer and exercised control over the terms and conditions of her employment, including her job assignment, training, scheduling, workplace rules, discipline, Human Resources processes, leave and accommodation processes, and termination.

16. Actus acted through its officers, managers, supervisors, Human Resources personnel, employees, agents, and other representatives acting within the course and scope of their employment or agency.

17. At all times relevant to this action, Actus was an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b), was engaged in an industry affecting commerce, and

employed fifteen or more employees for each working day in each of the twenty or more calendar weeks in the current or preceding calendar year.

## III. JURISDICTION, VENUE, AND ADMINISTRATIVE EXHAUSTION

18. This action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. §2000e-5(f)(3)

19. Venue is proper in the United States District Court for the Western District of Wisconsin pursuant to 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices occurred at Actus's Sparta, Wisconsin facility in Monroe County, Wisconsin.

20. Olson timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission alleging discrimination and retaliation arising from her employment with Milk Specialties Company d/b/a Actus Nutrition.

21. On August 21, 2026, the EEOC issued Olson a Notice of Right to Sue.

22. Olson commenced this action within ninety days of receiving the Notice of Right to Sue and has satisfied the administrative prerequisites to bringing her Title VII claims.

## IV. FACTUAL ALLEGATIONS

### A. Olson Begins Work at Actus and Is Treated Differently After Coworkers Learn She Is Married to a Woman

23. Olson began working for Actus at its Sparta, Wisconsin facility on April 20, 2026.

24. Actus assigned Olson to train and work in the dryer area as a Production Operator. The position required her, as a new employee, to learn Actus's production equipment, operating procedures, monitoring requirements, sampling procedures, cleaning processes, and other plant practices from more experienced employees.

25. Among the employees who trained or instructed Olson were Hunter Scott ("Scott"), Timothy Skidmore ("Skidmore"), Dan Folkema ("Folkema"), and Jacob Schwalbach ("Schwalbach"). Olson depended on those employees to answer questions, demonstrate unfamiliar tasks, and teach her how to perform the position safely and competently.

26. During Olson's first weeks at Actus, her working relationships with the employees training her were generally professional.

27. Before Schwalbach learned that Olson was married to a woman, he answered Olson's questions, assisted her when she needed help, and demonstrated work she was still learning.

28. Olson did not make her sexual orientation a subject of workplace conversation when she began working at Actus.

29. In approximately mid-May 2026, during an ordinary workplace conversation about plans outside of work, Olson mentioned that she and her wife had plans together.

30. Schwalbach, Skidmore, and Scott were present. After coworkers asked what Olson meant by "wife," Olson explained that she was married to a woman, identified her wife as Selena, and showed them photographs of her.

31. After Schwalbach learned that Olson was married to a woman, his treatment of her changed.

32. Schwalbach became less willing to assist Olson with work she was still learning.

33. Schwalbach became increasingly impatient when Olson asked questions and increasingly critical of her work.

34. Schwalbach began telling Olson that tasks were "her job," questioning why she needed help, directing her to consult her notes, and suggesting that she should already know how to perform work she had been learning for only approximately one month.

35. Schwalbach also began avoiding direct communication with Olson. On occasions when Olson was standing nearby within earshot, Schwalbach would direct Scott to relay work instructions to Olson rather than speak to Olson himself, including telling Scott, in substance, to "tell her" what needed to be done.

36. On one occasion after Schwalbach learned that Olson was married to a woman, Olson and Schwalbach were working together to clear a plugged dryer funnel by striking the equipment with hammers.

37. During that work, Schwalbach repeatedly criticized Olson's efforts, told her she was performing the task incorrectly, and emphasized that she could not strike the equipment as hard as he could.

### B. Schwalbach Makes His Anti-LGBTQ Hostility Explicit and Olson Reports the Discrimination to Actus

38. On June 1, 2026, Olson was working in the dryer operator room with Skidmore and Folkema when Schwalbach entered and raised a news report concerning an individual in Appleton, Wisconsin, who had attempted to burn a Pride flag.

39. Schwalbach stated, in substance, that he wished the individual had succeeded and "Fuck them LGBTQ."

40. Olson responded by reminding Schwalbach that she was standing directly in front of him, stating words to the effect of, “Hello, I’m right here.”

41. Schwalbach responded, **“Oh yeah, that’s right. You’re one of them.”**

42. Schwalbach also contrasted Pride Month with Wisconsin’s recognition of Dairy Month, stating in substance that it was “Dairy Month,” not LGBTQ month.

43. Olson continued reporting to work.

44. On June 7, 2026, Olson was again working in the dryer area when Schwalbach entered and announced, “Happy Dairy Month, everybody,” while glaring at Olson.

45. Olson understood Schwalbach’s comments as communicating that recognition of LGBTQ persons was illegitimate or objectionable and that Schwalbach’s hostility toward LGBTQ people included Olson personally.

46. Later that day, Olson reported the matter to Actus supervisor Alan Zin.

47. Zin told Olson that he would contact Stephanie Armstrong in Human Resources concerning her complaint.

48. Olson also contacted Armstrong directly that evening and provided Actus with an audio recording documenting the workplace conduct about which she was complaining.

49. Armstrong reviewed the recording and thereafter informed Olson that the matter needed to be escalated within Actus.

50. Armstrong further informed Olson that corporate Human Resources would handle the investigation.

51. By the evening of June 7, Actus had actual notice that Olson was reporting discriminatory workplace conduct based upon her sexual orientation.

52. Corporate Human Resources thereafter interviewed Olson concerning the June 1 incident, the change in Schwalbach's treatment of her, and the circumstances that caused Olson to believe she was being discriminated against.

53. Actus suspended Schwalbach and Skidmore without pay while it investigated Olson's complaint.

54. During the investigation, corporate Human Resources informed Olson that the allegations were sufficiently serious that termination of Schwalbach and Skidmore was being considered.

**C. Actus Returns Schwalbach and Skidmore to Work, and the Workplace Harassment Escalates into a Violent Threat**

55. On June 15, 2026, corporate Human Resources informed Olson that Schwalbach and Skidmore would be returned to work.

56. Actus told Olson that, after consulting corporate counsel, it had concluded that it could not rely upon portions of the recording because Olson had left the room while the recording continued.

57. Actus further told Olson that terminating Schwalbach and Skidmore based upon the recording could expose Actus to grievances or wrongful-termination challenges through the employees' union.

58. Actus nevertheless knew independently that Olson had personally heard and reported Schwalbach's June 1 remarks, including his hostility toward LGBTQ people and his statement identifying Olson as "one of them."

59. By June 15, Schwalbach and Skidmore knew that Olson had reported their conduct and that her complaint had resulted in their suspension from work.

60. Olson was informed by a union representative that Schwalbach and Skidmore had been warned concerning appropriate workplace conduct and retaliation.

61. After Actus informed Olson that Schwalbach and Skidmore would return, Olson asked corporate Human Resources what Actus intended to do to protect her and permit her to work safely.

62. Corporate Human Resources told Olson, in substance, that there was little or nothing further Actus could do.

63. Actus did not provide a plan that separated Schwalbach or Skidmore from Olson within the facility.

64. Actus permitted Olson to arrive and punch in at approximately 5:45 p.m. for her 6:00 p.m. shift in an effort to avoid encountering Schwalbach during shift change.

65. That measure did not separate Schwalbach or Skidmore from Olson within the facility or restrict their access to the areas where Olson worked.

66. Learning that Schwalbach and Skidmore would return to work caused Olson significant anxiety. On June 15, 2026, Olson contacted a nurse triage line because of the severity of her symptoms and was advised to seek emergency medical care.

67. Actus permitted Olson to remain home on June 15 with pay. When Olson advised Actus that she was still not comfortable returning on June 16, Actus required her to use available floating-holiday time for that absence. Olson was regularly scheduled off on June 17 and June 18.

68. Olson nevertheless returned to work on June 19 and completed her shift without incident.

69. Schwalbach and Skidmore were not working Olson's shift on June 19.

70. Olson did not work the night of June 20.

71. On June 21, 2026, Olson returned to Actus for her next scheduled shift.

72. Olson arrived at approximately 5:45 p.m., obtained her work uniform, and entered the women's locker room to prepare for work.

73. Olson had an assigned blue metal locker in the women's locker room. Her name was displayed on the outside of the locker, identifying it as hers.

74. Olson opened her assigned locker and discovered a message written in black marker on the inside of the locker door.

75. The message stated, as written: **"Your done Dike"** and **"Snitchs get stit."**

76. Olson understood "Dike" to be a misspelled use of the anti-lesbian slur "dyke," and understood "Snitchs get stit" to mean "snitches get stitches."

77. Olson had last used the locker when she completed her June 19 night shift on the morning of June 20, 2026. The message was not present when she left.

78. Olson discovered the message when she returned for her next scheduled shift at approximately 5:45 p.m. on June 21, 2026.

79. Schwalbach and Skidmore each worked at the Sparta facility during portions of the period between Olson's departure on the morning of June 20 and her return at approximately 5:45 p.m. on June 21.

80. Olson customarily left her locker shut when she finished work. When she approached it on June 21, the door appeared shut but was not fully latched.

81. Olson immediately photographed the message.

82. Olson did not begin her shift. She left the locker area because she was frightened and experiencing an acute emotional and physical reaction to what she had found.

83. Olson began shaking, crying, and having difficulty breathing.

84. Olson contacted Human Resources and Actus plant management and provided them with the photograph of the message.

85. Actus management instructed Olson to report the matter to law enforcement.

86. Olson followed that instruction and drove directly to the Sparta Police Department.

87. The Sparta Police Department opened Case No. ***SPD-CR260724*** concerning the incident.

88. The report identified the incident as a "THREATS : THREATS COMPLAINT" occurring at Actus Nutrition's Sparta facility, described the writing as an "anti-gay/threatening message" found inside Olson's locker.

89. The police report classified the reported conduct as "**947.01(1) - Disorderly Conduct - Hate Crime**."

90. Olson told police that she had last used the locker when she finished her prior shift on the morning of June 20 and that no writing was present at that time. Police therefore documented that the message appeared sometime between approximately 6:00 a.m. on June 20 and Olson's return at approximately 5:45 p.m. on June 21.

91. Olson also informed police that employee names were displayed on the outside of the individual lockers, including the locker assigned to her.

92. Olson informed police that neither the women's locker room nor the hallway immediately outside it was monitored by security cameras capable of identifying who entered the area during the relevant period.

93. During the investigation, Officer Jonathan Brey contacted Schwalbach concerning the message.

94. Schwalbach told police that he already knew about the message and that, after learning of it, he immediately contacted his supervisor and union steward because *he believed he would be accused* of writing it.

95. Schwalbach further told police that he had recently been suspended from Actus because of a recording made by Olson.

96. Schwalbach denied writing the message and denied knowing who wrote it.

97. The police investigation did not establish the identity of the person who wrote the message.

98. Olson does not allege that she personally witnessed Schwalbach, Skidmore, or any other particular person write the message.

99. By June 21, 2026, Actus knew that Olson had reported anti-LGBTQ workplace conduct, that Schwalbach and Skidmore had been suspended and returned to work after learning of her complaint, and that, within days of their return, someone had entered Olson's identified workplace locker and left a message referring both to her sexual orientation and to her status as a "snitch."

**D. The Locker Threat Causes Severe Psychological Injury and Prevents Olson from Returning to Work**

100. After discovering the locker message on June 21, Olson did not return to work at Actus.

101. In the days that followed, Olson experienced severe and uncontrollable anxiety, hypervigilance, panic symptoms, insomnia, nightmares, impaired concentration, crying spells, and fear of returning to the workplace.

102. Olson reported that she began watching the windows of her home, keeping the shades drawn, avoiding leaving the house, and experiencing irritability and conflict with her family that was atypical for her.

103. On June 26, 2026, Olson was evaluated by her primary-care provider, Tina Opelt, APNP, concerning the decline in her mental health following the events at Actus.

104. Olson told Opelt that she had enjoyed her job at Actus, believed she had been performing it well, and had been functioning well before the workplace events. Because of the resulting anxiety and fear, however, Olson was unable to return to work.

105. Opelt documented that Olson's symptoms were acute and included anxiety, panic attacks, insomnia, impaired concentration, social avoidance, and the re-emergence of post-traumatic-stress symptoms and nightmares that Olson had not experienced for many years.

106. Opelt assessed Olson with acute PTSD symptoms, acute severe nightmare disorder, and adjustment insomnia associated with the recent workplace events.

107. Because of the severity of Olson's symptoms, Opelt recommended that Olson remain out of work indefinitely while receiving treatment and behavioral-health therapy.

108. Opelt prescribed medication to treat Olson's nightmares and insomnia and referred her for behavioral-health treatment.

109. Olson thereafter continued receiving behavioral-health care. Her providers issued repeated written restrictions on June 30, July 7, July 14, and July 21 stating that Olson should remain out of work until further notice.

## E. Olson Seeks Medical Leave and Disability Benefits, and Actus Terminates Her Five Days Later

110. Olson did not resign from Actus or communicate an intention to abandon her employment.

111. While Olson remained medically restricted from returning to work, she continued pursuing the employment-related benefits and leave available to her.

112. Olson initially pursued workers' compensation benefits arising from the workplace events.

113. After Actus's workers' compensation carrier denied that claim, Olson sought to transition to Actus's short-term disability and medical-leave process.

114. On July 23, 2026, Olson sent a written communication to Stephanie Armstrong in Human Resources advising Actus that she remained **"out of work on a continuous, doctor-ordered medical restriction due to severe health conditions."**

115. In the same communication, Olson requested the paperwork necessary to pursue short-term disability benefits through her employment.

116. Olson copied her legal counsel on the communication and requested that communications concerning the benefits process be maintained in writing.

117. Nothing in Olson's July 23 communication stated that she intended to resign or abandon her position.

118. Instead, the communication advised Actus that Olson remained medically unable to work and was actively pursuing available leave and disability benefits.

119. Five days later, on July 28, 2026, Actus terminated Olson's employment.

120. In its termination letter, Actus stated that information received from Olson's healthcare provider indicated that Olson could not perform the duties of a Production Operator, with or without accommodation.

121. Actus further stated that remote work was not feasible for Olson's Production Operator position and that Actus could no longer continue holding Olson's position open.

122. Olson had been continuously absent from the workplace for approximately five weeks when Actus terminated her.

123. Actus knew that Olson's inability to return to the Sparta facility began immediately after she discovered the anti-lesbian and anti-"snitch" threat inside her assigned locker.

124. Actus therefore relied, as a stated basis for terminating Olson, upon the inability to return to work that followed the discriminatory and retaliatory workplace events alleged above.

125. On August 11, 2026, Voya completed its review of Olson's leave and disability claim.

126. Voya approved Olson's short-term disability benefits beginning July 23, 2026, and approved benefits through August 23, 2026.

127. Voya also approved Olson for non-FMLA medical leave from July 23 through August 21, 2026, totaling 176 hours, or 4.4 weeks.

128. The approved non-FMLA leave period therefore included July 28, 2026: the date Actus terminated Olson's employment.

129. Voya denied federal FMLA leave because Olson was not yet eligible, but approved the same requested absence as non-FMLA leave for Olson’s serious health condition.

**F. Olson Challenges Her Termination Through the Union Grievance Procedure**

130. On August 6, 2026, Olson initiated a grievance through Teamsters Local 120 challenging the circumstances surrounding her treatment and termination.

131. Olson’s grievance expressly complained that she had been subjected to a hostile work environment because she is a lesbian, that she had reported the discriminatory conduct to Human Resources, that the employees she reported were returned to work, that she subsequently discovered an anti-lesbian and retaliatory threat inside her locker, and that Actus ultimately terminated her employment.

132. Olson's grievance expressly challenged the discrimination, harassment, locker threat, and termination described above.

133. The collective bargaining agreement provided that new employees would serve a ninety-calendar-day probationary period and that the Employer could extend the probationary period for an additional thirty calendar days with notice to the employee and the Union.

134. Olson began working for Actus on April 20, 2026, and Actus terminated her employment on July 28, 2026.

135. Actus subsequently acknowledged in writing that more than ninety calendar days had elapsed between Olson’s hire date and the date Actus terminated her employment.

136. On August 10, 2026, after Olson had been terminated and after she initiated the grievance procedure, Actus contacted the Union and requested that the Union agree to an extension of Olson’s probationary period.

137. The Union declined Actus's request.

138. On August 25, 2026, Actus issued its written response denying Olson's grievance.

139. Actus first asserted that Olson had not completed the probationary period because she ceased actively working during that period, and contended that her probationary period should be "equitably tolled" during her medical absence.

140. Actus alternatively asserted that it was exercising its right to extend Olson's probationary period to 120 calendar days.

141. Specifically, Actus stated: "The Company hereby exercises that contractual right and confirms that Ms. Olson's probationary period was extended through one hundred twenty (120) calendar days."

142. Actus further stated that its August 25 grievance response itself "constitutes notice to both Ms. Olson and the Union of that extension."

143. Thus, the written document in which Actus purported to extend Olson's probationary period was issued *after* Actus had already terminated Olson, after Olson had challenged her treatment and termination through the grievance procedure, and after the Union had declined Actus's August 10 request concerning an extension.

144. Actus then relied upon its asserted probationary status to contend that Olson had no recourse to the grievance and arbitration procedure and to deny her grievance on that basis.

145. Actus alternatively asserted that, even if Olson were entitled to pursue the grievance, it possessed just cause to terminate her because she remained unable to perform the essential functions of the Production Operator position, no reasonable accommodation would permit her to perform those functions, and there was no known timeframe in which she could return to work.

**COUNT I**

**HOSTILE WORK ENVIRONMENT BECAUSE OF SEX/SEXUAL ORIENTATION**

**(Title VII of the Civil Rights Act of 1964 – 42 U.S.C. § 2000e-2(a)(1))**

146. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 145 of this Complaint as though fully set forth herein.

147. Title VII prohibits an employer from discriminating against an individual with respect to her compensation, terms, conditions, or privileges of employment because of sex. 42 U.S.C. § 2000e-2(a)(1).

148. Discrimination against an employee because of her sexual orientation constitutes discrimination because of sex within the meaning of Title VII.

149. Olson is a woman who is married to another woman and is protected from discrimination because of sex, including sexual orientation.

150. Olson was subjected to unwelcome workplace conduct because of her sexual orientation.

151. Jacob Schwalbach, an experienced Actus employee who provided Olson with job instruction and training, initially assisted Olson, answered questions, and communicated with her normally. After Schwalbach learned that Olson was married to a woman, his treatment of Olson materially changed. He became less willing to assist her, increasingly criticized her work, declined to answer questions concerning tasks she was still learning, and at times communicated instructions to Olson through another employee rather than speaking directly to her. Compl. ¶¶ 23-37.

152. Schwalbach thereafter made the discriminatory basis for that changed treatment explicit. On June 1, 2026, while Olson was working in the dryer operator area, Schwalbach

expressed support for an attempted burning of a Pride flag, stated in substance "Fuck them LGBTQ," and, when Olson reminded him that she was present and gay, responded, "Oh yeah, that's right. You're one of them." On June 7, Schwalbach again entered Olson's work area and announced, "Happy Dairy Month, everybody," while glaring at Olson. Compl. ¶¶ 38–45.

153. Olson promptly reported the discriminatory conduct to Actus supervisor Alan Zin and Human Resources representative Stephanie Armstrong, provided Armstrong with the recording she had made, and participated in the resulting investigation conducted by Actus Corporate Human Resources. Actus thereby acquired actual notice that Olson was alleging harassment because of her sexual orientation and suspended Schwalbach and Skidmore without pay while it investigated. Compl. ¶¶ 46–54.

154. Actus thereafter returned Schwalbach and Skidmore to the workplace. At that time, Actus knew independently that Schwalbach had made anti-LGBTQ statements directly in Olson's presence, and Schwalbach and Skidmore knew that Olson had reported their conduct and that her complaint had resulted in their suspension. Olson was also informed that they had been warned concerning workplace conduct and retaliation. Compl. ¶¶ 55–60.

155. Despite that knowledge, Actus did not meaningfully separate Olson from Schwalbach or Skidmore within the facility. Instead, Actus permitted Olson to arrive and punch in approximately fifteen minutes early in an effort to avoid Schwalbach during shift change. That measure did not separate the employees inside the facility or otherwise secure Olson's work environment. Compl. ¶¶ 61–65.

156. On June 21, 2026, within days of Schwalbach and Skidmore returning to work, Olson discovered an anti-lesbian and threatening message written inside her specifically assigned workplace locker stating, as written, "Your done Dike" and "Snitchs get stit." The message targeted Olson both through an anti-lesbian slur and through a reference to her reporting workplace misconduct. Compl. ¶¶ 71–99.

157. Olson immediately reported the locker threat to Armstrong and Actus plant management, provided photographic evidence, and, at Actus management's direction, reported the threat to the Sparta Police Department. Actus therefore had actual notice that the discriminatory workplace hostility had continued and materially escalated after its initial intervention. Compl. ¶¶ 81-99.

158. The workplace environment was objectively and subjectively offensive, and the discriminatory conduct was sufficiently severe or pervasive to alter the conditions of Olson's employment and create an abusive working environment.

159. Considering the totality of the circumstances, the conduct progressed from differential treatment by an employee responsible for assisting in Olson's training, to express anti-LGBTQ hostility directed at Olson, to renewed targeted conduct after Olson complained, and ultimately to a personally directed anti-lesbian and threatening message inside Olson's assigned locker.

160. The conduct interfered with Olson's ability to perform her employment and ultimately rendered her medically unable to return to the Sparta workplace after June 21. Compl. ¶¶ 100–109.

161. Actus knew or should have known of the discriminatory harassment and failed to take prompt and effective corrective measures reasonably calculated to prevent its continuation and protect Olson from further harassment.

162. Actus's remedial measures did not end the hostile environment. After Actus acquired actual notice, investigated the matter, suspended the employees involved, and returned them to work, the workplace hostility escalated into an expressly anti-lesbian and threatening message inside Olson's assigned locker.

163. Actus's acts and omissions therefore subjected Olson to discrimination with respect to the terms, conditions, and privileges of her employment because of sex, including sexual orientation, in violation of 42 U.S.C. § 2000e-2(a)(1).

164. As a direct and proximate result of Actus's violation of Title VII, Olson suffered damages including loss of employment income and benefits, emotional pain and suffering, mental anguish, humiliation, inconvenience, medical and related expenses, and other compensable losses.

**COUNT II**

**RETALIATION**

**(Title VII of the Civil Rights Act of 1964 – 42 U.S.C. § 2000e-3(a))**

165. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 164 as though fully set forth herein.

166. Title VII prohibits an employer from discriminating against an employee because she opposed a practice made unlawful by Title VII or otherwise engaged in activity protected by Title VII. 42 U.S.C. § 2000e-3(a).

167. Olson engaged in protected activity when she opposed and reported conduct she reasonably and in good faith believed constituted discrimination and harassment because of her sexual orientation.

168. On June 1, Olson directly objected to Schwalbach's anti-LGBTQ remarks by reminding him that she was present and was herself gay. Compl. ¶¶ 38-45.

169. On June 7, Olson escalated her opposition through Actus's formal management and Human Resources channels by reporting the conduct to supervisor Alan Zin and Human Resources representative Stephanie Armstrong and by providing Armstrong with evidence supporting her complaint. Compl. ¶¶ 46-54.

170. Actus Corporate Human Resources thereby acquired actual knowledge of Olson's protected activity, interviewed her concerning the discrimination, and suspended Schwalbach and Skidmore while investigating her complaint. Compl. ¶¶ 46-54.

171. Schwalbach and Skidmore also became aware that Olson had reported their conduct and that her complaint had resulted in their suspension. Olson was informed that they had been warned concerning appropriate workplace conduct and retaliation. Compl. ¶¶ 55–60.

172. Actus nevertheless returned Schwalbach and Skidmore to the workplace without meaningfully separating them from Olson or otherwise providing her with a meaningful safety plan. Compl. ¶¶ 61–70.

173. Within days of their return, an unidentified person with access to Olson's specifically assigned workplace locker left the message “Your done Dike” and “Snitchs get stit” inside the locker. The reference to Olson as a “snitch,” paired with an anti-lesbian slur and appearing shortly after her discrimination complaint, expressly referenced her reporting activity and constituted evidence of retaliatory hostility. Compl. ¶¶ 71–99.

174. Olson immediately reported the threat to Actus Human Resources and plant management, thereby engaging in additional protected activity and providing Actus with actual notice of the apparent retaliation. Compl. ¶¶ 81–99.

175. The retaliatory hostility materially affected Olson. After attempting to continue working notwithstanding her original complaint and Actus's decision to return Schwalbach and Skidmore to work, Olson became medically unable to return only after discovering the June 21 threat. Compl. ¶¶ 100–109.

176. Actus knew the circumstances producing Olson's work absence and knew that the absence began immediately following the anti-lesbian and anti-"snitch" threat.

177. Olson thereafter remained medically restricted from returning to work and continued communicating with Actus concerning her employment status, medical leave, disability benefits, and potential accommodation. Compl. ¶¶ 100–118.

178. On July 23, 2026, Olson expressly informed Actus that she remained subject to a continuous doctor-ordered work restriction and requested the paperwork necessary to pursue Actus's short-term disability benefits. Compl. ¶¶ 110–118.

179. Five days later, on July 28, Actus terminated Olson's employment. The termination occurred approximately seven weeks after her June 7 discrimination complaint and approximately five weeks after the June 21 retaliatory threat. Compl. ¶¶ 119–124.

180. Actus stated that it terminated Olson because she remained unable to perform the Production Operator position, with or without accommodation, and because Actus could no longer continue holding her position open. Compl. ¶¶ 120–124.

181. At the time it terminated Olson, Actus knew that her inability to return followed immediately after the discriminatory and retaliatory workplace events of which Actus had actual notice.

182. Olson continued opposing the alleged discrimination and retaliation after her termination. On August 6, 2026, she initiated a grievance expressly challenging the hostile work environment, her report to Human Resources, the subsequent locker threat, and the termination of her employment. Compl. ¶¶ 130–132.

183. Olson's August 6 grievance constituted additional protected opposition to conduct she reasonably believed violated Title VII.

184. Four days later, on August 10, 2026, Actus asked the Union to agree to an extension of Olson's probationary period. The Union declined. Compl. ¶¶ 136–137.

185. On August 25, 2026, Actus denied Olson's grievance and asserted that Olson should be treated as having remained a probationary employee when her employment ended. Compl. ¶¶ 138–145.

186. Although Actus acknowledged that more than ninety calendar days had elapsed between Olson's April 20 hire date and her July 28 termination, Actus asserted that her probationary period should be equitably tolled during her medical absence or, alternatively, extended to 120 calendar days. Compl. ¶¶ 133–145.

187. Actus stated in its August 25 response that it was “hereby” exercising the contractual right to extend Olson's probationary period and that the August 25 response itself constituted notice to Olson and the Union of the extension. Compl. ¶¶ 140–143.

188. Actus then relied upon that asserted probationary status to contend that Olson had no recourse to the grievance and arbitration procedure and to deny her grievance on that basis. Compl. ¶¶ 143–145.

189. Title VII's anti-retaliation provision protects former employees from materially adverse post-employment retaliation and is not limited to retaliatory conduct occurring during the employment relationship.

190. Olson alleges that Actus's assertion, after her termination and after she challenged that termination, that her probationary period had been extended, and Actus's reliance upon that assertion to deny her recourse through the grievance procedure, constituted materially adverse post-employment conduct that could dissuade a reasonable worker from opposing or reporting discrimination.

191. Independently, the timing and circumstances of Actus's post-termination probationary assertions are additional evidence of retaliatory intent and causation, including because Actus first sought the Union's agreement to an extension after Olson had been terminated and after she filed her grievance, the Union declined, and Actus thereafter asserted that its own grievance response constituted notice of an extension.

192. The circumstances supporting retaliatory causation include, collectively, Actus's actual knowledge of Olson's discrimination complaint; the suspension and subsequent return of the employees she reported; their knowledge of Olson's complaint; the warning against retaliation; the subsequent “snitch” threat; Olson's immediate reporting of that threat; the resulting work absence known to Actus; the timing of her termination; her continued opposition through the grievance procedure; and Actus's subsequent conduct concerning her probationary status and grievance rights.

193. Olson's protected activity was a but-for cause of materially adverse treatment, including the circumstances culminating in Actus's July 28 termination and the materially adverse post-employment conduct alleged above.

194. Actus thereby retaliated against Olson for opposing and reporting discrimination prohibited by Title VII, in violation of 42 U.S.C. § 2000e-3(a).

195. As a direct and proximate result of Actus's retaliation, Olson suffered lost wages and benefits, loss of employment, emotional pain and suffering, mental anguish, humiliation, inconvenience, and other compensable damages.

## COUNT III

## DISCRIMINATORY DISCHARGE BECAUSE OF SEX/SEXUAL ORIENTATION

### Title VII of the Civil Rights Act of 1964 – 42 U.S.C. § 2000e-2(a)(1)

196. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 195 of this Complaint as though fully set forth herein.

197. Title VII prohibits an employer from discharging an employee because of sex. 42 U.S.C. § 2000e-2(a)(1).

198. Discrimination against an employee because of her sexual orientation constitutes discrimination because of sex.

199. Olson is a woman married to another woman and was therefore protected against discrimination because of her sexual orientation.

200. Before Olson's sexual orientation became known to her coworkers, her employment experience was generally favorable. Employees responsible for training Olson assisted her, answered her questions, and treated her professionally. After Schwalbach

learned that Olson was married to a woman, his treatment of her materially changed: he became less willing to assist her, increasingly critical of her work, less willing to answer questions, and at times unwilling to communicate with her directly. Compl. ¶¶ 23–37.

201. Schwalbach thereafter made the discriminatory nature of his workplace hostility explicit by expressing hostility toward LGBTQ persons in Olson's presence and personally identifying Olson as "one of them." Compl. ¶¶ 38–45.

202. Olson reported the discriminatory treatment to Actus management and Human Resources. Actus thereby obtained actual knowledge of the discriminatory workplace conduct, investigated Olson's complaint, suspended Schwalbach and Skidmore, and subsequently returned them to the workplace. Compl. ¶¶ 46–60.

203. Within days of their return, Olson discovered an anti-lesbian and threatening message inside her specifically assigned workplace locker. Olson immediately provided Actus with photographic notice of the threat. Compl. ¶¶ 71–99.

204. Olson thereafter became medically unable to return to the Sparta facility as a result of the severe psychological symptoms that followed the locker threat. Actus knew the circumstances under which her work absence began. Compl. ¶¶ 81–109.

205. Despite her inability to return physically to the Sparta facility, Olson continued attempting to preserve the employment relationship. She remained in communication with Actus, pursued workers' compensation and disability benefits, requested medical leave, and did not resign or abandon her position. Compl. ¶¶ 110–118.

206. On July 23, 2026, Olson expressly notified Actus that she remained subject to a continuous doctor-ordered medical restriction and requested the paperwork necessary to

pursue short-term disability benefits. Five days later, on July 28, Actus terminated her employment. Compl. ¶¶ 114–119.

207. Actus stated that it terminated Olson because information from her healthcare provider indicated that she could not perform the Production Operator position, with or without accommodation, because remote work was not feasible, and because Actus could no longer continue holding her position open. Compl. ¶¶ 120–124.

208. Actus knew when it relied upon Olson's inability to return that her continuous inability to work at the Sparta facility began immediately after the anti-lesbian and anti-"snitch" threat of which Actus had actual notice.

209. On August 11, Voya subsequently approved Olson's short-term-disability benefits beginning July 23 and approved non-FMLA medical leave from July 23 through August 21, 2026. The approved leave period therefore included July 28, the date Actus terminated Olson's employment. Compl. ¶¶ 125–129.

210. Actus's treatment of the employees implicated in Olson's discrimination complaint also forms part of the circumstances surrounding the discharge. Actus initially suspended Schwalbach and Skidmore, but ultimately returned them to work after advising Olson that terminating them could expose Actus to grievances or wrongful-termination challenges through the Union. Compl. ¶¶ 53–60.

211. Olson does not allege that Schwalbach or Skidmore were similarly situated comparators for every purpose. Their treatment is nevertheless relevant to the overall circumstances because Actus elected to preserve their employment after Olson's discrimination complaint, while approximately five weeks after the discriminatory workplace hostility escalated into the locker threat, Actus terminated Olson.

212. After Olson challenged her termination through the grievance procedure, Actus acknowledged that more than ninety calendar days had elapsed between her hire and termination, sought the Union's agreement to an extension of her probationary period, and, after the Union declined, subsequently asserted that its own grievance response constituted notice extending Olson's probationary period. Compl. ¶¶ 130–145.

213. Actus then relied upon its asserted probationary status to contend that Olson had no recourse through the grievance and arbitration procedure, while alternatively defending the termination on the medical and accommodation grounds stated above. Compl. ¶¶ 138–145.

214. The circumstances surrounding Olson's discharge include the change in her treatment after her sexual orientation became known; express anti-LGBTQ hostility directed at her; Actus's actual knowledge of that hostility; the failure of Actus's initial response to prevent further discriminatory conduct; the subsequent violent anti-lesbian threat; Actus's knowledge that the threat precipitated Olson's inability to return; Olson's continuing efforts to preserve her employment; Actus's treatment of the employees implicated in her complaint; the timing of her termination; and Actus's subsequent defense of that termination. Considering those circumstances as a whole, Olson alleges that her sex and sexual orientation were a motivating factor in the decision to discharge her.

215. Actus thereby discriminated against Olson because of sex, including sexual orientation, with respect to her discharge in violation of 42 U.S.C. §§ 2000e-2(a)(1) and 2000e-2(m).

216. As a direct result of Actus's unlawful discriminatory discharge, Olson suffered lost wages and employment benefits, loss of employment, emotional pain and suffering, mental anguish, inconvenience, humiliation, and other damages recoverable under Title VII.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Jennifer Olson respectfully requests that the Court enter judgment in her favor and against Defendant Milk Specialties Company d/b/a Actus Nutrition and award the following relief:

A. Declare that Defendant subjected Plaintiff to unlawful discrimination, a hostile work environment, retaliation, and discriminatory and retaliatory discharge in violation of Title VII;

B. Award Plaintiff all back pay, lost wages, lost benefits, and other employment compensation she would have received but for Defendant's unlawful conduct, together with prejudgment interest;

C. Order Plaintiff's reinstatement to an appropriate position with restored seniority, compensation, and benefits, or, if reinstatement is not feasible or appropriate, award Plaintiff front pay in lieu of reinstatement;

D. Award Plaintiff compensatory damages as permitted by 42 U.S.C. § 1981a, including damages for emotional pain and suffering, inconvenience, mental anguish, humiliation, and other pecuniary and nonpecuniary losses caused by Defendant’s unlawful conduct;

E. Award punitive damages pursuant to 42 U.S.C. § 1981a(b)(1) upon proof that Defendant engaged in unlawful discrimination or retaliation with malice or reckless indifference to Plaintiff's federally protected rights;

F. Award such equitable and injunctive relief as the Court determines necessary and appropriate to remedy Defendant's violations of Title VII and prevent further discrimination and retaliation;

G. Award Plaintiff her reasonable attorney fees, litigation expenses, and taxable costs pursuant to 42 U.S.C. § 2000e-5(k) and other applicable law;

H. Award post-judgment interest as provided by law; and

I. Award such other and further legal or equitable relief as the Court deems just and appropriate.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.

DATED this 8th day of October, 2026

Respectfully Submitted,

**Eau Claire Legal LLC**

/s/ David Carlson
**Eau Claire Legal, LLC**
**Attorney David Carlson**
405 S. Farwell St. #6,
Eau Claire, WI 54701
(715) 495-7445
david@eauclaire.legal
WI SBN: 1138342

/s/ Joshua Wilson
**Eau Claire Legal, LLC**
**Attorney Joshua Wilson**
125 TownPark Drive, STE #300
Kennesaw, Georgia, 30144
(888) 867-5291
Ga Bar Number 551969
Wi Bar Number 1135903
josh@eauclaire.legal

Attorneys for Plaintiff